**************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

**************************************************

SOUTHHAVEN ASSOCIATES, LLC *v.*
MCMERLIN, LLC, ET AL.
(AC 35834)

Sheldon, Keller and Schaller, Js.

*Argued December 4, 2014—officially released August 4, 2015*

(Appeal from Superior Court, judicial district of
Waterbury, Housing Session, Zemetis, J.)

*Francis G. Linn*, self-represented, the appellant
(defendant).

*Craig S. Taschner*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The defendant Francis G. Linn, guarantor of a commercial lease agreement, appeals from the judgment of the trial court in favor of the plaintiff landlord, Southhaven Associates, LLC, in this action brought against the defendant tenant and the defendant guarantors of the lease.[1] On appeal, the defendant claims that the court erred in its factual findings with regard to his special defense of failure to mitigate damages and in its calculation of damages. We affirm the judgment of the trial court.

The plaintiff brought this action against its tenant, McMerlin, LLC (McMerlin), and against Shane McMurray and the defendant, the guarantors of a commercial lease agreement between the plaintiff and McMerlin. The complaint alleged theories of recovery based on breach of lease and guarantees, quantum meruit, promissory estoppel, and unjust enrichment. The defendants filed special defenses asserting, inter alia, failure to mitigate damages.[2] At the start of the trial, the parties filed a stipulation of facts setting forth the basic controversy between them. In its memorandum of decision, the court found additional facts relevant to the resolution of the parties' claims. The following facts, therefore, are based on the stipulation of the parties and the facts found by the court.

The plaintiff and McMerlin, a limited liability company solely owned by McMurray, entered into a written lease agreement dated June, 2007. Pursuant to the lease, the plaintiff was to provide McMerlin with certain rental property for use as a liquor store in a shopping plaza located at 100 Main Street North in Southbury.[3] The lease was for a term of ten years. On or about June 27, 2007, McMurray personally guaranteed the lease pursuant to a signed lease guarantee. Also on that date, the defendant, a secured creditor of and consultant for McMurray, personally guaranteed the lease pursuant to a signed lease guarantee.[4]

Pursuant to the lease, the plaintiff leased the subject premises to McMerlin for a base minimum, monthly rent of $5635.50 for the first two years of the lease, plus a certain proportionate share of the operating expenses, taxes, and merchant dues. For the first year under the lease, the monthly amount due for rent and all other charges was $7233.80. McMerlin paid that amount from August, 2007 until March, 2008, when it ceased paying the monthly charges and other rent due under the lease. The plaintiff served a notice to quit on McMerlin on October 22, 2008, and, thereafter, initiated a summary process action against McMerlin. McMerlin vacated and surrendered the premises to the plaintiff on October 28, 2008.[5] The defendant and McMurray failed to fulfill their obligations under their guarantees. The plaintiff then initiated the present action to recover damages

for, inter alia, breach of lease and guarantees.

Following the evidentiary portion of the trial, the court found in favor of the plaintiff on its breach of lease and guarantees claim and rendered judgment against the defendants, jointly and severally, in the amount of $433,430.90, plus reasonable attorney's fees and expenses. Having found the existence of a contract in count one, the court rendered judgment in favor of the defendants on the remaining counts, all of which were based on quasi contractual theories of recovery.[6] The defendants then filed the present appeal, arguing that the court erred in its factual findings regarding the special defense of failure to mitigate damages and in its calculation of damages. The appeal was subsequently dismissed as to McMerlin and McMurray, leaving the defendant as the sole appellant in this matter.

I

The defendant first claims that the court erred in its factual determinations regarding his special defense of failure to mitigate damages. We disagree.

"Connecticut law is clear that [i]n an action for rent due, a lessor of commercial property is generally under no obligation to mitigate his damages after the lessee fails to pay rent. . . . Such an obligation arises only if the lessor manifests an intent to terminate the tenancy either by taking an unequivocal act showing this intent or by bringing an action for damages based on the tenant's breach of contract. . . . The duty to mitigate damages [does] not require the plaintiff [landlord] to sacrifice any substantial right of its own . . . or to exalt the interests of the tenant above its own. . . . It [is] required to make reasonable efforts to minimize damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." (Citations omitted; internal quotation marks omitted.) *Brennan Associates* v. *OBGYN Specialty Group., P.C.*, 127 Conn. App. 746, 754, 15 A.3d 1094, cert. denied, 301 Conn. 917, 21 A.3d 463 (2011).

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Ray Weiner, LLC* v. *Connery*, 146 Conn. App. 1, 9, 75 A.3d 771 (2013). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 185, 90 A.3d 219 (2014).

The court in the present case first considered the

defendants' claim that the plaintiff failed to mitigate damages prior to the termination of the lease. In this regard, Christopher Gatto, the manager of the plaintiff, testified that, prior to the termination of the defendant's lease, the defendant explained that he could no longer fund the business and had relocated out of state. At that point, the plaintiff decided to seek qualified substitute tenants. The court heard testimony that the plaintiff and Paul Moeller engaged in negotiations regarding the subject premises from July, 2008 until October 15, 2008, when the negotiations terminated. The court found, however, that Moeller "had many problems with the existing lease between the plaintiff and the defendants. Moeller would not accept an assignment of that lease.[7] Nonetheless, the plaintiff . . . sought to negotiate with Moeller to create a new lease. Ultimately, Moeller testified that under no circumstances would he personally guarantee the performance of the lease, but proposed instead that the sole tenant would be [a limited liability company] with little or no assets. Under the circumstances, the [plaintiff] had every right to reject such an unreasonable proposal." (Footnote added.)

Our review of the evidence in the record supports the court's finding regarding the transaction between the plaintiff and Moeller. Contrary to the defendant's claim, the record indicates that the plaintiff attempted to negotiate with Moeller. Moeller, however, would not agree to an assignment of the existing lease and would not personally guarantee the lease. We, therefore, do not conclude that the court's factual finding in this regard was clearly erroneous.

The court next considered the defendant's claim that the plaintiff failed to mitigate damages following the termination of the lease. In support of this claim, the defendant presented evidence from several witnesses to support his claim that the plaintiff refused to negotiate with potential tenants. John Nejaime, one of the potential tenants, testified that he learned about the availability of the subject premises in November, 2008, and had only one telephone conversation with Gatto, before deciding to pursue other options. Wayne Duris, another potential tenant, testified that in the late spring of 2009, he considered the premises for use as a liquor store. This transaction, however, was never completed as there were "too many obstacles" and there was no agreement regarding the price of the defendant's business.[8]

The plaintiff presented evidence to establish that it had taken steps to lease the premises to another tenant following the termination of the lease. Specifically, Jason Wuchiski of Rhys, LLC, previously GVA Williams, the exclusive leasing agent for the plaintiff, testified about his efforts to lease the premises for the plaintiff. He described the standard marketing package that was distributed to potential tenants and the initial negotia-

tions with prospective tenants, including GameStop, BevMax and other liquor stores, and a nail salon. Wuchiski also testified about efforts to increase the frontage to make the premises more marketable. Gatto testified regarding efforts of GVA Williams and Wuchiski to lease all of the premises in the shopping plaza[9] and about prospective tenants, including several nail salons and GameStop. On the basis of this evidence, the court found that "[t]he defendants directed a number of potential purchasers of their business to the [plaintiff] to determine whether those potential purchasers of McMerlin . . . could qualify as suitable tenants in the plaintiff's mall. None of the potential purchasers and/or prospective lessees was willing or able to reach agreement with the [plaintiff] on the same terms as the defendants had reached agreement with the [plaintiff]. . . . In sum, the court finds that voluminous testimony [of several witnesses] established that the [plaintiff] did consistently make reasonable efforts to mitigate the defendants' damages by making reasonable efforts to [lease] the subject property before and after the defendant McMerlin defaulted on its contractual obligations."[10]

"It is well established that it is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . [The] fact finder is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 308 Conn. 719, 737, 66 A.3d 848 (2013). On the basis of our review of the record, and with deference to the court's factual findings, we do not conclude that the court's finding with regard to the defendant's claim of failure to mitigate damages following the termination of the lease was clearly erroneous.[11] Accordingly, the defendant cannot prevail on his claim.

II

The defendant next claims that the court erred in its calculation of damages. Specifically, the defendant argues that because the lease was terminated on or about November, 2008, he should not be held liable for rent after that time. We conclude, however, that the court properly calculated the damages due to the plaintiff.

We first note that the trial court "has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . When, however, a damages award is challenged on the basis of a question of law, our review [of that question] is

plenary." (Citation omitted; internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 49–50, 925 A.2d 334 (2007); see also *K & R Realty Associates* v. *Gagnon*, 33 Conn. App. 815, 820, 639 A.2d 524 (1994).

"[W]hen the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender. . . . Where the landlord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages. . . . When the landlord elects to terminate the tenancy, however, the action is one for breach of contract . . . and, when the tenancy is terminated, the landlord is obliged to mitigate his damages. . . . The general rule for the measure of damages in contract is that the award should place the injured party in the same position as he would have been in had the contract been performed." (Citation omitted; internal quotation marks omitted.) *Brennan Associates* v. *OBGYN Specialty Group, P.C.*, supra, 127 Conn. App. 754.

In the present case, it is undisputed that the plaintiff served a notice to quit on McMerlin on October 22, 2008. Service of the notice to quit manifested the plaintiff's intent to terminate McMerlin's tenancy. See id., 755. On October 28, 2008, McMerlin vacated and surrendered the premises to the plaintiff. As a consequence, McMerlin was no longer obligated to make monthly rental payments. Because the plaintiff instituted an action for breach of lease, however, the remaining rental payments due under the lease could be used as part of the calculation of the damages that the plaintiff sustained. See id.; *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 389–90, 558 A.2d 265 (1989). Accordingly, we conclude that the court, after noting that the plaintiff had re-leased the property effective October 1, 2011, properly awarded damages for the plaintiff comprised of rent, common area maintenance charges, merchant dues, and interest through the end of September, 2011.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This action was brought against McMerlin, LLC, Shane McMurray, and Francis G. Linn. Although the appeal was filed by the three named defendants, it was subsequently dismissed as to McMerlin, LLC, and McMurray, leaving Linn as the sole appellant in this matter. For purposes of this opinion, therefore, we refer to Linn as the defendant, to the other defendants individually by name, and to all of the defendants collectively as the defendants.

[2] The defendants asserted special defenses alleging fraud in the inducement, fraud, failure to mitigate damages, and payment and setoff. The defendants also filed setoffs and counterclaims, asserting payment and setoff, fraud in the inducement, fraud, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and statutory theft.

[3] The lease referred to the property as store number 13 at 100 Main Street North in Southbury. Christopher Gatto, the manager of the plaintiff, testified at trial that the property was actually store number 11, and that the reference to store number 13 in the lease was a typographical error.

[4] Pursuant to the lease guarantees, McMurray and the defendant, jointly and severally, "guarantee[d] to [the plaintiff] its successors and assigns, the full and timely payment, performance and observance of all the covenants, conditions and agreements provided to be performed and observed by [McMerlin] in said Lease, including without limitation, the prompt payment of all principal, interest, the Indebtedness (as defined in Section 45 of the Lease) [pertaining to payment for fixtures] and all other amounts provided in said lease to be paid by [McMerlin]."

[5] The housing court rendered judgment of possession in favor of the plaintiff on November 13, 2008.

[6] The court further found that the defendants had failed to establish the elements necessary to prevail on their special defenses, counterclaims, and setoffs alleging fraud in the inducement, fraud, failure to mitigate damages, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and statutory theft. The court found merit to the defendants' claim of payment, specifically noting that the defendants posted a security deposit in the amount of $15,042.45 with the plaintiff and paid $35,000 toward an equipment purchase from the plaintiff.

[7] We note that paragraph 21 (b) of the lease stated in relevant part: "Landlord's consent to any assignment of this Lease, or the subletting of the Leased Premises shall also be conditioned upon (1) any such assignee or sublessee shall agree with Landlord in writing, prior to any such assignment or subletting, to be bound by and to perform all covenants and conditions of this Lease applicable to Tenant; (2) that Tenant shall remain liable for observance and performance of all of the covenants and conditions of this Lease; and (3) that notice of such assignment or subletting is given to Landlord no less than fifteen (15) days prior thereto."

[8] Although Duris testified about obstacles that prevented the transaction from going forward, he testified that he did not recall making a determination that the plaintiff was an obstacle.

[9] The following exchange occurred between the plaintiff's counsel and Gatto during direct examination:

"Q. And how do [GVA Williams and Wuchiski] go about their work for you?

"A. A number of ways. They have—they do what's called a blitz where they'll prepare a package of material on any given shopping center and then send it by e-mail out to the real estate community to all the brokerage firms who might be—have representatives who—who represent tenants. They also attend various real estate events through the ICSE, which is an organization related to the field. And, in addition, they cold call—they really use every means necessary.

"Q. Okay. And they do that for any vacant space you have in that particular shopping center?

"A. Yes.

"Q. All right. And at the time that [McMerlin] vacated this space, did you have other vacant space in the shopping center?

"A. We had some—

"Q. Okay.

"A. —yes.

"Q. All right. And GVA Williams and Mr. Wuchiski at that time were working to fill all the space if they could?

"A. Yes."

[10] The court further stated: "The [plaintiff] affirmatively took more than reasonable efforts to lease the subject premises promptly and continuously following the termination of the lease until the property was [re-leased] effective October 1, 2011. During the years between the termination of the lease and the [re-leasing], the [plaintiff] continuously advertised, through competent real estate agents, the subject premises, together with other vacancies in the mall, as well as cataloguing, meeting, vetting, and negotiating with potential tenants of the lease space. All the conduct of the [plaintiff] can be described as consistent with reasonable business behavior. The [plaintiff] appears to have made no distinction between the lease efforts of the subject premises and lease efforts made of any other vacancy in the mall. The plaintiff was operating the mall for profit and wished to have the premises fully leased and took commercially reasonable efforts to do so."

[11] We note that the defendant also questions the truthfulness of the witnesses who testified for the plaintiff. In this regard, we reiterate that "[i]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *Suntech of Connecticut, Inc.* v. *Lawrence Brunoli, Inc.*, 143 Conn. App. 581, 589,

n.3, 72 A.3d 1113, cert. denied, 310 Conn. 910, 76 A.3d 626 (2013).