******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SUNTECH OF CONNECTICUT, INC. *v.* LAWRENCE
BRUNOLI, INC., ET AL.
(AC 38301)

Lavine, Beach and Bishop, Js.

*Argued December 15, 2016—officially released May 23, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Wahla, J.)

*Lawrence G. Rosenthal*, with whom was *Denise Pur-pura*, for the appellant (plaintiff).

*Margaret Fogerty Rattigan*, for the appellee
(named defendant).

*Bradford R. Carver*, for the appellee (defendant
Safeco Insurance Company of America).

*Opinion*

LAVINE, J. This breach of contract action arises out of the construction of a technology center at Naugatuck Valley Community College (project),[1] which is owned by the state of Connecticut (state). In essence, the complaint alleged that the defendant general contractor breached the subcontract by preventing the plaintiff subcontractor from timely performing pursuant to the terms of the subcontract and by wrongly withholding funds from it. We affirm the judgment of the trial court.

The plaintiff subcontractor, Suntech of Connecticut, Inc., appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the defendant general contractor, Lawrence Brunoli, Inc. (contractor), and the defendant bonding company, Safeco Insurance Company of America (insurer).[2] On appeal, the plaintiff claims that the court (1) abused its discretion with respect to its evidentiary rulings and (2) failed, as a matter of law, to adopt the reasoning of a Massachusetts trial court when adjudicating the plaintiff's claims that the contractor was responsible for the failure of the project to be completed on time. Although the plaintiff's evidentiary claims raise troubling issues, the plaintiff cannot prevail as it has failed to demonstrate that the court's alleged abuse of discretion was harmful.

In summary, the contractor entered into a construction contract (contract) with the state to build the new technology center. The plaintiff, a Connecticut corporation that fabricates and installs glass and curtain walls, entered into a subcontract with the contractor to provide services and materials for the project. The contract required that the project be completed within 640 days from the date the project commenced (completion date), but the project was not completed within that time. The plaintiff claims that the contractor was responsible for the late completion and that it failed to pay the plaintiff moneys it was owed under the subcontract.

On July 9, 2010,[3] the plaintiff commenced the present action against the contractor and insurer, claiming that it suffered money damages as the result of the delayed completion, that it performed work outside the subcontract for which it was not paid, and that it was not paid retainage[4] at the completion of the project, among other things. The plaintiff alleged four counts against the contractor for breach of contract, unjust enrichment, delay, and violation of General Statutes § 49-41a;[5] and one count against the insurer pursuant to General Statutes § 49-42.[6] The contractor denied the substantive allegations of the complaint and alleged seven special defenses.[7] The court found in favor of the defendants on all counts, and the plaintiff appealed to this court.

On appeal, the plaintiff asserts that the evidence demonstrates that during the course of the project, at the

contractor's request, it performed work outside the scope of the subcontract and that it was not paid for such work. In addition, the contractor hindered and interfered with the plaintiff's ability to complete its work, which resulted in the plaintiff's being unable to complete its work for more than two years beyond the completion date. The plaintiff claims that the evidence demonstrates that it suffered damages due to the contractor's hindrance and interference. In addition, the contractor completed the project approximately two years after the completion date and, thereafter brought a claim against the state for approximately $7 million. The state settled the contractor's claim for $1.65 million, but the contractor never paid the plaintiff for the work it performed outside the subcontract, for retainage, or the damages it suffered as a result of the contractor's hindrance and interference. Although the plaintiff claims that the court improperly found in favor of the defendants, it does not claim that any of the court's factual findings are clearly erroneous. The plaintiff's claims are mostly of an evidentiary nature, but also assert that the court erred in failing to adopt the reasoning of a Massachusetts trial court case as to hindrance and interference. The findings and reasoning of the court follow.

The court issued a lengthy memorandum of decision on July 31, 2015. Among other things, the court found that in May, 2006, the plaintiff submitted a revised proposal pursuant to the project's design specifications that were prepared by Amenta/Emma Architects, P.C. (architect).[8] The plaintiff's quotation was $1,050,790; the contractor incorporated the plaintiff's bid in its own bid to the state. The state awarded the project to the contractor, and the two entered into the contract for the project for the price of $25,015,700. The contract required the project to begin on May 26, 2006, and to be completed by February 22, 2008, the completion date. On May 26, 2006, the plaintiff's president, Michael Berkun, signed the subcontract, and on June 29, 2006, the contractor's president, Lawrence Brunoli, Jr., signed the subcontract.[9] The court construed the terms of the subcontract and found that they were not ambiguous, and that the parties were sophisticated business entities.

Paragraph V of the subcontract provides in relevant part: "The Contractor agrees to begin, prosecute and complete the entire work specified by the [state] in an orderly manner so that the Subcontractor will be able to begin, prosecute and complete the work described in this subcontract . . . . *The subcontractor agrees that the construction schedule is approximate only and is subject to change; the subcontractor agrees to accept responsibility for adhering to a fluctuating schedule; the Subcontractor agrees not to assess any delay damages or claims against [the contractor] unless the Owner accepts responsibility and payment.*"

(Emphasis added.) The court, therefore, found that the plaintiff agreed that the construction schedule was approximate only, was subject to change, and that the plaintiff agreed to accept responsibility for a fluctuating schedule and not to assess any delay damages or claims against the contractor unless the state accepted responsibility and made payment. Any changes to the subcontract were to be executed in writing or by written change order from the contractor. The plaintiff's subcontract was a lump sum contract; no "human hours" were mentioned in it.

The court found that, due to design issues between the Department of Public Works (department) and the architect, construction of the pedestrian bridge delayed completion of the project.[10] The court also found that the state determined that the plaintiff was responsible for installing the materials necessary to attach the curtain wall to the pedestrian bridge and directed the plaintiff to complete the work. The plaintiff, however, did not install the materials, and the contractor had to hire another subcontractor to attach the curtain.[11]

The court further found that at the time the plaintiff was working on the project it also was working on four or five other "jobs" and that the project was of relatively low importance to the plaintiff. The plaintiff generally assigned only two to four laborers to work on the project, had complete control over its laborers, and was able to utilize the building in any way that it chose. The plaintiff failed to provide the number of laborers necessary to complete the project, and the contractor repeatedly sent messages and requests to the plaintiff with respect to the "manpower" issue. The contractor met with the subcontractors every week to discuss the schedule, to coordinate work, and to provide information regarding work areas and access to them in the week ahead. The court found that the contractor did not intentionally or deliberately fail to coordinate or manage the work of the subcontractors on the project. Despite numerous delays that were beyond the contractor's control, the state did not grant it an extension of time to finish the project.

The plaintiff was to be paid in accordance with paragraph II of the subcontract, which required that its bill be approved by the contractor and the state, and that all payments were subject to a 5 percent retainage. The plaintiff was not to be paid in full until all work was completed and all warranties, guarantees, and spare parts were in place, and the contractor had receive final payment from the state.

On March 31, 2007, a representative of the plaintiff certified under oath that the plaintiff had purchased 80 percent of its glass. On December 30, 2008, the representative certified under oath that 99 percent of the plaintiff's work had been completed, and on November 13, 2009, representative testified under oath that 99 percent

of the plaintiff's payment for the glass had been completed. The last day the plaintiff worked on the project was May 7, 2009. The plaintiff filed a certificate of substantial work in January, 2009, indicating that it had complied with the scope of the work. According to the certificate, the last day of work should have been January 21, 2009, not May 7, 2009. The plaintiff only had to deliver the warranties under the specifications, but it did not settle or deliver those warranties until the day of trial. The warranty start date was January 21, 2009.

In the fall of 2009, in response to the contractor's request for delay caused by design issues, the plaintiff claimed damages of $24,722.95. In April, 2010, pursuant to General Statutes § 4-61, the contractor submitted a claim to the state. The plaintiff amended its "request for equitable adjustment," seeking $555,582.31 in damages. The plaintiff's claim against the state could not be presented together with the contactor's claim. Although the state and the contractor settled the contractor's claim, the state did not accept responsibility for the delay in completing the project.

The court adjudicated the five counts the plaintiff alleged as follows. As to count one, the court found that the plaintiff alleged that the contractor breached the subcontract by failing to request payment from the department and failing to remit payments to it for all work it had performed on the project. Following the presentation of evidence, the plaintiff sought to distinguish its present action against the contractor from *Suntech of Connecticut, Inc.* v. *Lawrence Brunoli, Inc.*, 143 Conn. App. 581, 72 A.3d 1113, cert. denied, 310 Conn. 910, 76 A.3d 626 (2013) (*Suntech I*). The court concluded that the legal issues in the present case are identical to those in *Suntech I*.[12]

The essence of the plaintiff's breach of contract claim is that the contractor's hindrance and interferences resulted in the plaintiff's not being able to complete its work until May 7, 2009. As a consequence of the hindrance and interference, the plaintiff claimed that it had suffered damages in the amount of $365,289.54 plus fees and that the contractor wrongly withheld retainage in the amount of $45,802.23. The contractor argued that the "no damages for delay" clause in the subcontract precluded recovery. The plaintiff contended that the damages it suffered arose, not from a delay, but from the contractor's hindrance and interference.[13] The court found that the project was delayed primarily by design issues between the department and the architect, not by the contractor. The court, therefore, concluded that the plaintiff had failed to prove its breach of contract claim.

With respect to count two, the plaintiff alleged that the contractor benefitted from the plaintiff's labor, materials, equipment, and services without fully paying

for them and, therefore, had been unjustly enriched. The plaintiff produced unpaid change orders in the amount of $162,305.35. The contractor responded that, as a matter of law, the plaintiff had failed to prove that it was without a remedy under the subcontract and that it was required to do so in order to prevail on a claim of unjust enrichment. The court found that the contractor, in fact, had overpaid the plaintiff as the contractor had to complete some of the work the plaintiff had been contracted to perform, but did not. As a result, the contractor incurred additional expenses. The court also found that the plaintiff had failed to provide five contractually required warranties that were acceptable to the state. For the foregoing reasons, the court found that the plaintiff failed to prove its claim of unjust enrichment.

Regarding count three, the court found that the plaintiff embellished its breach of contract allegations by alleging that it was "forced to contend with various disruptions, delays, suspensions, scope changes and changed conditions caused by or controlled by [the contractor] due to numerous project change orders, proposal requests, architect's supplemental instructions, construction change directives, requests for information and nonpayment." (Internal quotation marks omitted.) The plaintiff claimed that its performance period ran from January 25, 2007, to July 23, 2009, which was sixteen months longer than originally scheduled, and the delays increased the cost of materials, labor, and overhead in excess of $555,502.31. In its posttrial brief, the plaintiff argued that the contractor breached the subcontract by not providing it with access to the site and an orderly progression of the work. The contractor countered that delays are inevitable on a construction project, but even if the plaintiff was able to prove delay damages, the subcontract specifically barred the plaintiff from claiming them unless the state accepted responsibility for the delay and paid for it.

As to the evidence presented, the court found that Berkun's testimony was neither credible nor persuasive. The plaintiff called Joel Baranowski, the state's project manager, to testify on its behalf, but under cross-examination, his testimony was damaging: the plaintiff failed to have sufficient "manpower" on the project and failed to deliver warranties due under the contract that were acceptable to the state. Finally, the court found that the plaintiff had been overpaid by $3361.13 and was not due any retainage. There was no credible evidence that it had performed any work outside the scope of the subcontract for which a change order would have been issued. The court, therefore, concluded that the plaintiff had failed to prove that it had suffered damages due to delay.

In count four, the plaintiff asserted a claim under § 49-41a. During the course of the trial, the plaintiff

stipulated that it timely had been paid all moneys due it for any amounts included on requisitions.[14] In its memorandum of decision, the court stated that it had addressed the plaintiff's claims for retainage in adjudicating count three, and, for those reasons, the plaintiff could not prevail on count four.

Count five was alleged against the insurer. Although the plaintiff was paid all moneys due it pursuant to requisitions, the plaintiff alleged that it was due unpaid retainage. The plaintiff alleged that the insurer had violated § 49-42 when it failed to pay the plaintiff's claim made under the bond issued to the contractor. The court concluded that the plaintiff had failed to prove the allegations in count five.

The court, therefore, rendered judgment in favor of the defendants on all counts. The plaintiff appealed. Additional facts will be set forth as needed.

I

The plaintiff claims that the court abused its discretion with respect to three evidentiary rulings by (1) failing to permit one of its witnesses to testify as an expert, (2) failing to permit the plaintiff to disclose the witness as an expert during the course of his testimony, and (3) reversing its ruling on a motion in limine on the last day of trial.[15] The plaintiff perceives unfairness in the court's rulings. Although the court abused its discretion by sustaining several of the contractor's objections to the questions posed by the plaintiff on direct examination; see footnotes 19 and 21 of this opinion; we conclude that the plaintiff has failed to demonstrate that it was harmed.

We begin with the standard of review applicable to evidentiary rulings. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [appellant] of substantial prejudice or injustice.

"[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result. . . . Any testimony in a case that tends of itself or in connection with other testimony to influence the result on a fact in issue is material. If the testimony would tend to affect the verdict of the [trier of fact], it meets the test of materiality." (Citation omitted; internal quotation marks omitted.)

*Mamudovski* v. *BIC Corp.*, 78 Conn. App. 715, 730, 829 A.2d 47 (2003), appeal dismissed, 271 Conn. 297, 857 A.2d 328 (2004).

A

The plaintiff first claims that the court abused its discretion with respect to Rick Cianfaglione by precluding him from testifying as to his observations and perceptions at the project site, and his conversations with the contractor's employees. We conclude that the court did not abuse its discretion when it precluded Cianfaglione from offering expert testimony, and that, in any event, the plaintiff has failed to demonstrate that it was prejudiced by the court's ruling.

The following additional facts are relevant to the plaintiff's claims. Prior to the commencement of the present action, the contractor brought an action against the state. See *Lawrence Brunoli, Inc.* v. *State*, Superior Court, judicial district of Hartford, Docket No. CV-12-6028601-S (*Brunoli* case). As part of its defense in the *Brunoli* case, the state retained Cianfaglione, a scheduling expert, to review change orders, permits, supplemental instructions, and schedules during the course of the project. He also met with the contractor on numerous occasions. Cianfaglione authored and submitted reports to the state in which he recorded his findings as to the contractor's progress.

In July, 2013, in the present action, the plaintiff noticed Cianfaglione's deposition and issued a subpoena duces tecum for him to bring all documents, reports, and analysis that he authored with respect to the *Brunoli* case. The state filed a motion for a protective order, which the trial court, *Schuman, J.*, denied because Cianfaglione was not an attorney, but an expert witness. Judge Schuman ordered the plaintiff to pay Cianfaglione's expenses in connection with the deposition.[16] Cianfaglione subsequently was deposed by the parties.

On November 20, 2014, during the course of trial, the contractor filed a motion to preclude the plaintiff from presenting expert testimony from Cianfaglione and putting his reports into evidence on the ground that the plaintiff had not disclosed him as an expert witness in violation of Practice Book § 13-4.[17] The plaintiff had disclosed three individuals as expert witnesses, but not Cianfaglione. In its trial management report, the plaintiff identified Cianfaglione as a fact witness and marked for identification several reports Cianfaglione had prepared on behalf of the state in the *Brunoli* case. The contractor claimed generally that it would be prejudiced if Cianfaglione were permitted to testify as an expert witness, but it did not explain how it would be prejudiced.

On November 21, 2014, the plaintiff called Cianfaglione to testify in its case-in-chief. At that time, the court

heard oral argument on the contractor's motion in limine. Counsel for the contractor argued that all of Cianfaglione's testimony should be precluded. The plaintiff objected to the motion to preclude as it was not filed prior to trial and, therefore, was not timely. The court having reviewed the procedural history of the case, noted that Judge Schuman had declared Cianfaglione an expert, the plaintiff had disclosed Cianfaglione as a fact witness, and that he had been deposed. The court ruled that it would permit Cianfaglione to testify as a fact witness and that it would rule, question by question, whether his testimony was inadmissible expert testimony.[18] During Cianfaglione's direct testimony, counsel for the contractor objected to certain questions posed by the plaintiff, and the court sustained the objections.[19]

On appeal, the plaintiff claims that the court abused its discretion when it (1) precluded Cianfaglione from testifying as to his perceptions, observations, and conversations with the contractor, and (2) would not permit the plaintiff to put "instrumental evidence" into evidence. It contends that the contractor had "deposed Mr. Cianfaglione ad nauseam" and, therefore, could not be surprised nor prejudiced by his testimony.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . Even if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary [impropriety], there also must be harm. . . .

Our Supreme Court has "articulated the test for the admission of expert testimony, which is deeply rooted in common law. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Dow-Westbrook, Inc.* v. *Candlewood Equine Practice, LLC*, 119 Conn. App. 703, 720, 989 A.2d 1075 (2010).

The substance of the plaintiff's claim is that the court abused its discretion by not permitting Cianfaglione to testify as to his perceptions, that is, what he observed at the site of the project. The plaintiff has cited cases during which lay witnesses were permitted to testify

as to their perceptions, e.g., whether a step was steep; see *Mack* v. *LaValley*, 55 Conn. App. 150, 154–58, 738 A.2d 718, cert. denied, 251 Conn. 928, 742 A.2d 363 (1999); whether an individual was too intoxicated to operate a motor vehicle safely. See *State* v. *Lamme*, 19 Conn. App. 594, 605, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990).[20]

Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." "Lay witnesses are permitted to give opinions when the evidence as to such matters might otherwise be difficult or impossible to obtain in any other form. . . . A lay witness must state the facts that are within his or her personal knowledge, however, and not give an opinion concerning such facts." C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.1.2, p. 510. "[A] lay witness may give his impression or opinion of conditions or circumstances which are so numerous or complicated that he could not otherwise adequately describe them or otherwise convey to the jury the impression which they gave to him." *State* v. *McGinnis*, 158 Conn. 124, 131, 256 A.2d 241 (1969).

"A witness, who is also expert in a field, is not thereby disqualified from testifying to personal observations on a matter, including giving a non-expert opinion on a subject on which a layperson could also opine." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 7.1.2, p. 445. "The general rule is that witnesses must state facts and not their individual opinions, but there are exceptions to this rule as well established as the rule itself." (Internal quotation marks omitted.) *Johnson* v. *Newell*, 160 Conn. 269, 277, 278 A.2d 776 (1971).

Witnesses are permitted to testify as to what they perceive. Cianfaglione, therefore, should have been permitted to testify as to what he observed when he walked onto the project site, such as the number of laborers present, which was a factual inquiry. The court had ruled that it would permit the plaintiff to make factual inquiries of Cianfaglione. The court should have overruled the contractor's objection that the answer called for an opinion. The plaintiff's claim fails, however, because it has not demonstrated how it was harmed by the court's sustaining the contractor's objections. Counsel made an offer of proof that Cianfaglione's testimony would have shown that the contractor, not the state or architect, hindered and interfered with the plaintiff's ability to perform. That representation, however, is a legal conclusion, not the facts to which Cianfaglione would have testified. See id. ("No offer of proof appears in the record. Without knowing the purpose of the offer or the answer that might be forthcoming we

are unable to rule on this assignment of error.") Because the plaintiff has failed to demonstrate that the court's rulings were harmful to it, it cannot prevail on its claim that the court abused its discretion by sustaining some of the contractor's objections to its direct examination of Cianfaglione.

B

The plaintiff claims that the court abused its discretion when it denied its oral motion to disclose Cianfaglione as an expert that it made during the course of Cianfaglione's testimony. We disagree.

During the course of Cianfaglione's direct testimony, the court sustained many of the contractor's objections to the questions posed by the plaintiff. Counsel for the plaintiff, therefore, offered an oral motion, while Cianfaglione was testifying on direct examination, to disclose him as an expert witness. Counsel represented that the contractor would not be prejudiced by such testimony as it had deposed Cianfaglione. The court denied the motion without explanation, despite the plaintiff's request for a reason.[21] The plaintiff did not file a motion for articulation. See Practice Book §§ 60-5 and 61-10.

On appeal, the plaintiff argues that the court abused its discretion by denying its motion to disclose Cianfaglione as an expert witness because the court did not hold a hearing on its motion. The plaintiff's claim is predicated on Practice Book § 13-4 (h), which provides: "A judicial authority may, after a hearing, impose sanctions on a party for failure to comply with the requirements of this section. An order precluding the testimony of an expert witness may be entered only upon a finding that: (1) the sanction of preclusion, including any consequence thereof on the sanctioned party's ability to prosecute or to defend the case, is proportional to the noncompliance at issue, and (2) the noncompliance at issue cannot adequately be addressed by a less severe sanction or combination of sanctions."

Practice Book § 13-4 (a) provides: "A party shall disclose each person who may be called by that party to testify as an expert witness at trial, and all documents that may be offered in evidence in lieu of such expert testimony, in accordance with this section. The requirements of Section 13-15 shall apply to disclosures made under this section."[22]

The record discloses that neither the plaintiff nor the contractor timely complied with our rules of practice or the court's trial management order. Contrary to the plaintiff's claim that the court failed to hold a hearing on its oral motion to disclose Cianfaglione, the court, in substance, considered the issue when it granted the contractor's motion to preclude the witness from testifying as an expert. Moreover, contrary to the plaintiff's claim, the court's sanction was proportional. The con-

tractor sought to preclude Cianfaglione from testifying as either a fact or expert witness. The court ruled that Cianfaglione could testify as a fact witness. For the foregoing reasons, the plaintiff's claim fails.

C

The plaintiff claims that the court abused its discretion by permitting the contractor to present testimony pertaining to its special defense of setoff. We need not decide whether the court abused its discretion by reversing its prior ruling granting the plaintiff's motion to preclude, because even if the court abused its discretion, the plaintiff has failed to demonstrate that it was harmed by the court's reversal of its prior ruling.

On or about October 27, 2014, the plaintiff filed a motion in limine to preclude the contractor from introducing any evidence, documents or testimony, in support of its special defense of "offset." In its motion, the plaintiff outlined the allegations of its complaint and the contractor's "offset" special defense. The plaintiff also set forth a certain interrogatory and request for production that it had served on the contractor in September, 2010, and the responses the contractor provided in January, 2011. In answering the plaintiff's interrogatory concerning the basis of its counterclaim or offset, the contractor responded "N/A." With regard to the corresponding production request, the plaintiff argued that the contractor provided "minimal documentation, none of which expressly or directly documents [its] claim for setoff" and failed to supply supplemental disclosure. The plaintiff contended that the contractor should be precluded from introducing evidence, including testimony, in support of its special defense of setoff. The plaintiff relied on Practice Book §§ 13-14 and 13-15[23] to support its position. Counsel for the contractor did not file a written objection to the motion in limine, but stated during argument on the motion that she preferred to argue against the motion in court.[24]

The parties appeared before the court to argue the plaintiff's motion in limine on November 18, 2014. The court read into the record interrogatory 17 and request for production 4, and the defendant's responses thereto. Counsel for the plaintiff argued that the plaintiff had asked for specific information and for the contractor to itemize the deductions or setoffs. He represented that the contractor also failed to attach the documents to substantiate its claimed setoffs. Counsel for the contractor stated that interrogatory 17 was ambiguous in that the contractor had not filed a counterclaim, only a setoff special defense. The contractor did not include a calculation of the sums deducted from the contract balance. Counsel for the contractor argued that the important point with regard to the interrogatory and the request for production was that documents and information were provided to the plaintiff during the course of the project.[25] The contractor claimed that

there was no prejudice to the plaintiff and that it should be permitted to offer testimony regarding the deductions it took from the plaintiff's contract price.

After hearing from the plaintiff as to its understanding of a setoff, the court ruled stating: "Based on what is before the court, the motion in limine is hereby granted. All right. But, I will allow in all fairness to the [contractor] to put up the evidence, whatever is from his personal knowledge . . . . But motion for the special defense is setoff, is hereby granted. Your motion in limine."[26] The court further stated: "I have granted your motion. Let me just be clear, the claim of offset is hereby granted. And that's it. So, we will move on."

On November 25, 2014, the last day evidence was presented, and during the testimony of Daniel Neagle, the contractor's vice president, counsel for the contractor asked the court to revisit its ruling on the plaintiff's motion in limine. At the time, the contractor presented the court with what it purported to be its compliance with the plaintiff's discovery requests. The court first addressed the motion in limine, which included the contractor's response to interrogatory 17 and request for production 4. The disclosure was not attached to the contractor's purported discovery compliance. Counsel for the contractor then represented to the court that on November 18, 2014, when the court ruled on the motion in limine, that she could not "100 percent represent" that the list of deductions had been disclosed because she was unable to locate the original discovery compliance. She also represented that on November 24, 2014, she had searched the files in her office and found the plaintiff's compliance in a box marked "DPW."[27] She represented that the list of deductions from the contract was disclosed, and the documents were attached.[28]

She also stated: "But, Your Honor, we have to at least have the court look at the responses to our interrogatories, which includes a full accounting of all of the deletions from the contract itself. It has a list of these warranty issues. It has a list of every check that [the contractor] sent to [the plaintiff]. These were reviewed and signed by my client, and they were in fact included in the documents that were attached to our responses. So, we would ask that the court revisit the motion in limine, given the disclosure that I can now make with 100 percent certainty that that list of deductions from the contract were provided to [the plaintiff's counsel] and his client in January of 2011, Your Honor. That's when our compliance was filed with the court." In addition, she represented that counsel for the plaintiff visited her office and "tagged" the disclosure.

Counsel for the plaintiff reviewed what the contractor's counsel had given to the court and stated that he did not receive the last three pages of what counsel represented had been disclosed. He stated that although

the contractor may have intended to disclose the information, the plaintiff never received it. Because the plaintiff never received the information, it filed the motion in limine. Over the plaintiff's objection, the court permitted Neagle to testify as to specific setoffs and/or deductions that the contractor took from the plaintiff's subcontract.

We recognize that the court reversed its ruling on the plaintiff's motion in limine on the last day of evidence pursuant to the representations of the contractor's counsel, not those of the plaintiff's counsel. Assuming, without deciding, that the court abused its discretion, the hypothetical abuse cannot form the basis of reversal and a new trial, which is the remedy the plaintiff seeks, as the plaintiff has failed to prove it was harmed by the court's reversing its decision. "Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Harmful error occurs in a civil action when the ruling would likely affect the result. . . . It is the plaintiff's burden to show harmful error." (Citations omitted; internal quotation marks omitted.) *Puchalski* v. *Mathura*, 82 Conn. App. 272, 275–76, 843 A.2d 685 (2004).

The issue in the present action was whether the contractor breached the subcontract and wrongly withheld certain funds from the plaintiff. The court found that the reason for the project delay was a design dispute between the state and the architect. On appeal the plaintiff has not claimed that this finding is clearly erroneous; its claims are primarily of an evidentiary nature. In fact, the plaintiff does not dispute that the design issue was not resolved until January, 2007. The present claim concerns the deductions the contractor took from the subcontract price, which have nothing to do with the breach. Interrogatory 7 and request for production 4 concern damages, not whether the contractor breached the subcontract. The court's ruling on the motion in limine would have been harmful if the plaintiff had proven that the contractor's acts were the cause of the project's not being finished by the completion date. Because the plaintiff has not demonstrated how it was harmed by the court's reversing its ruling on the motion in limine, its claim fails.

II

The plaintiff's nonevidentiary claim is that the court improperly found in favor of the contractor on count three of its complaint, which alleged that the plaintiff sustained damage as the result of delays caused by the contractor. The plaintiff argues that the court erred when it failed to adopt the reasoning of *Central Ceilings, Inc.* v. *Suffolk Construction Co.*, Docket No. SUCV200604129A, 2013 WL 8721044, *10–11 (Mass.

Super. December 19, 2013). We disagree.

In its memorandum of decision, the court found that the reason for the delay in the completion of the project was due to design issues between the state and the architect. With respect to count three, the court found that the plaintiff suffered no damages as a consequence of the contractor's actions and concluded that even if the contractor were responsible for the delay, the subcontract barred the plaintiff from bringing an action on the basis of delay. Significantly, the court concluded that the evidence presented did not support the plaintif's claim, whether it be delay, hindrance, or interference. The court found that the plaintiff "did not man the job properly" and that Berkun, the plaintiff's president, was "neither credible nor persuasive." There was no credible evidence to support the plaintiff's claim of interference. The plaintiff's claim that the contractor breached the subcontract by not providing access and orderly progression of the work is contrary to the evidence.

The court also found that the subcontract specifically prohibits delay damages, to wit: "[The] subcontractor agrees not to assess any delay damages or claims against [the contractor], unless the [state] accepts responsibility, and payment." (Internal quotation marks omitted.) The court found that the parties are sophisticated commercial entities and concluded that the language of the subcontract is not ambiguous. The court concluded, therefore, citing *Suntech of Connecticut, Inc.* v. *Lawrence Brunoli, Inc.*, supra, 143 Conn. App. 591, that the plaintiff was barred from seeking delay damages from the contractor.

On appeal, the plaintiff claim is that the "no damages for delay clause" in the subcontract is inapplicable because its claim is not predicated on a delay but, rather, on hindrance and interference caused by the contractor. The plaintiff relies on *Central Ceilings, Inc.*, to support its claim that a delay is an action that prevents a party from commencing work and hindrance or interference is an action that prevents a party from working in an orderly fashion, which is what the plaintiff claims happened in the present case. We are not persuaded.

We first examine the allegations of the plaintiff's complaint to determine the basis of its claim. "The interpretation of pleadings is always a question of law for the court. . . . In addition, [t]he allegations of the complaint must be given such reasonable construction as will give effect to [it] in conformity with the general theory which it was intended to follow, and do substantial justice between the parties. . . . It is axiomatic that the parties are bound by their pleadings." (Citation omitted; internal quotation marks omitted.) *O'Halloran* v. *Charlotte Hungerford Hospital*, 63 Conn. App. 460, 463, 776 A.2d 514 (2001).

Count three of the plaintiff's amended complaint is titled "Delay."[29] In paragraphs 11 through 13 and 16 of that count, the plaintiff alleged "[o]ver the course of the project, [the plaintiff] was forced to contend with various disruptions, delays, suspensions, scope changes and changed conditions caused by or controlled by [the contractor] due to numerous project change orders, proposal requests, architect's supplemental instructions, construction change directives, requests for information, and nonpayment. . . . The delays referenced in [paragraph] 11 constitute a failure by [the contractor] to comply with its contractual obligations to begin, prosecute and complete the entire work on the [p]roject in an orderly manner. . . . As a result of the aforementioned delays, [the plaintiff's] actual period of performance ran from January 25, 2007 to July 23, 2009, more than sixteen (16) months longer than originally scheduled. . . . The delays referenced in [paragraph] 11 of this count have caused damages to [the plaintiff] for increased costs of materials and labor, overhead, and direct job costs in excess of $555,502.31 to date."

The key language in this allegation is that the delays referenced in paragraph 11 constitute a failure by the contractor "to begin, prosecute and complete the entire work on the project in an orderly manner." This language tracks the language of paragraph V of the subcontract, which also contains the provision that the plaintiff agrees not to assess any delay damages or claims against the contractor. The plaintiff's complaint contains no specific factual allegations as to how the contractor failed to begin or prosecute the project.

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Suntech of Connecticut, Inc.* v. *Lawrence Brunoli, Inc.*, supra, 143 Conn. App. 585.

We have read and considered the Massachusetts trial court decision on which the plaintiff relies. See *Central Ceilings, Inc.* v. *Suffolk Construction Co.*, supra, 2013 WL 8721044. On the basis of our reading of *Central Ceilings, Inc.*, we conclude that the legal proposition for which it stands, i.e., the distinction between delay, hindrance and interference, is inapplicable to the facts of the present case. *Central Ceilings, Inc.*, concerned the construction of a college dormitory complex. The Massachusetts trial court found that the defendant Suffolk Construction Company, Inc. (Suffolk), failed to coordinate the work of the precursor trades, to set properly the elevation and control lines of construction, to address weather, heat and flooding issues, and to coordinate so as to avoid the "stacking of the trades,"[30] all of which Suffolk was required to do by contract. As a consequence of Suffolk's failure to coordinate the construction of the dormitory, the plaintiff Central Ceil-

ings, Inc. (Central), was not able to do the necessary framing and had to "demobilize" and "remobilize" its workforce, materials, and equipment. Id., *4.

Pursuant to the *Central Ceilings, Inc.*, subcontract, Central agreed that it "shall have no claim for money damages or additional compensation for delay no matter how caused, but for any delay or increase in the time required for performance of this [s]ubcontract not due to the fault of Central, Central shall be entitled only to an extension of time for performance  . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., * 8. The court found that Central did not cause the delay,[31] and that it requested an extension of time to complete its work. Suffolk refused to grant Central any extensions of time to perform. The Massachusetts trial court found that "[b]y not granting Central its requested extensions, Suffolk deprived Central of its contractually-mandated remedy. This deprivation is, itself, a breach of the [s]ubcontract, and Central's damages for loss of productivity are a direct result of this breach."

In the present case, the trial court found that the contractor was not responsible for any delay or damages, as the principal reason the project was not completed on time was the design dispute between the state and the architect. In addition, the court found that there was no credible evidence that the contractor prevented the plaintiff from working in an orderly fashion. *Central Ceilings, Inc.*, therefore, is factually and legally distinguishable from the present case, and the trial court properly declined to adopt it in adjudicating the present action.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The project called for the construction of a new technology building that included approximately 1 million square feet of new classroom, automotive, and kitchen space; a 2000 square foot enclosed pedestrian bridge that connected the new structure to an existing one; a new 5000 square foot greenhouse; the demolition of seven existing annex buildings and an existing concrete pedestrian bridge, and sidewalk; and renovations to the existing heating, ventilation, and air conditioning systems.

[2] The insurer is not a party to this appeal.

[3] The court found that there have been multiple actions between the parties since 2009.

[4] The court found that the plaintiff was to be paid pursuant to paragraph III of the subcontract, which provides in relevant part: "All billings must be approved by (the contractor) and the (state) . . . all payments are subject to retainage and/or other applicable provisions as contained in the contract documents . . . ."

[5] General Statutes § 49-41a is entitled "Enforcement of payment by general contractor to subcontractor and by subcontractor to its subcontractors."

[6] General Statutes § 49-42 is entitled "Enforcement of right to payment on bond. Suit on bond, procedure and judgment."

[7] The contractor alleged the following special defenses: (1) the plaintiff fails to state a claim on which relief can be granted; (2) the claim may be barred by the plaintiff's failure to comply with the terms of the subcontract; (3) any damages allegedly incurred by the plaintiff were caused by others over whom the contractor had no control; (4) the claim is barred or limited by set-offs and/or back charges against the plaintiff due to its own negligent and defective work on the project; (5) the plaintiff failed to mitigate its damages; (6) the plaintiff has been paid what it was due under the subcon-

tract; and (7) the claim may be barred by the plaintiff's failure to comply with statutory notice requirements and the applicable statute of limitations. The plaintiff denied the contractor's special defenses.

[8] The Department of Public Works hired the architect to design the project and to serve as the construction administrator.

[9] The subcontract required the plaintiff to furnish all materials, labor, and equipment to perform the work described in the contract specification and "Division O: Bidding requirements," "Division 1: General requirements," and "08411-Aluminum Store Fronts and Doors; 08800-Mirrored Glazing; 08840-Plastic Glazing; 08911-Glazed Aluminum Curtain Wall, as shown on contract drawings prepared by" the architect. The subcontract price was $1,040,000.

[10] The pedestrian bridge is a glass enclosed hallway connecting an existing building to the new technology building. The design issues concerned the manner in which the bridge was to be connected to the existing and new buildings, and how the heating, ventilation, and air conditioning system was to fit through the ceiling. The architect did not complete the design of the bridge until the latter part of 2007.

[11] In addition, the court found that after the completion date had passed, the plaintiff sought permission from the state to substitute the architect's specified manufacturer of the curtain wall system. The plaintiff submitted shop drawings that included a new design of the exterior glass walls. According to the plaintiff, its proposed change order from store front glass to curtain wall would be "a no additional cost" change, but it later submitted a change order proposal for $110,500 more than the materials specified by the architect. The state rejected the plaintiff's proposed change.

[12] The court found that the plaintiff contradicted its assertion that the claims in the present action are different from *Suntech I* in its motion for continuance filed on May 2, 2012. The plaintiff sought a continuance claiming that the present action is identical to *Suntech I*, which was on appeal. The plaintiff contended that the outcome of the *Suntech I* appeal would affect the present proceedings and that it would be a waste of judicial resources to try the present case before the appeal was decided.

[13] To support its position, the plaintiff asked the court to adopt a Massachusetts trial court decision, which distinguishes delay from hindrance and interference. See *Central Ceilings, Inc.* v. *Suffolk Construction Co.*, Docket No. SUCV200604129A, 2013 WL 8721044, *10–11 (Mass. Super. December 19, 2013).

[14] The parties entered into the following stipulation: "Count [four]. As to payments made on approved requisitions [the plaintiff] stipulates payments for only those approved requisitions that were made in accordance with [§] 49-41a. [The plaintiff] does not stipulate to payment of unapproved requisitions or retainage due.

"Count [five]. As to payments made only for approved applications for payment, [the plaintiff] stipulates those payments were made in accordance with the time frame set forth in [§] 49-42. [The plaintiff] does not stipulate that payments were made for retainage or unapproved requisitions and change orders."

[15] We take this opportunity to note that the evidentiary issues raised in this appeal are largely of the parties' own making in that they failed to comply with our rules of practice and the court's scheduling order. When faced with the parties' failure to comply with our rules of practice or the court's orders, we cannot conclude that a court abused its discretion by rigorously adhering to the rules of practice or a scheduling order.

[16] In its motion for protective order, the state represented that Cianfaglione had not been named as an expert in the present action and had not been retained as a consultant by any party. The state argued that Cianfaglione's work with respect to the project was protected from disclosure pursuant to the states' work product privilege and that the parties were seeking to obtain a free expert opinion. Judge Schuman issued the following order: "The plaintiff seeks the testimony and documents of an expert rather than that of an attorney. Therefore, the work product doctrine does not apply. . . . [B]ecause the plaintiff has subpoenaed an expert for deposition, it must pay his fees and expenses as provided in Practice Book § 13-4 (d) (3). Subject to this condition, the deposition may go forward." (Citation omitted.)

[17] Practice Book § 13-4 (a) provides: "A party shall disclose each person who may be called by that party to testify as an expert witness at trial, and all documents that may be offered in evidence in lieu of such expert testimony, in accordance with this section. The requirements of Section 13-15 shall apply to disclosures made under this section."

[18] In ruling, the court stated: "Now, to make this easy so that we move

along, this gentleman is being called as a fact witness. What facts he will testify . . . I do not have any idea. You might have [an] idea of what facts he is going to testify. So, the ruling on this motion is he's not . . . an expert witness. Anything . . . any expert testimony, any expert opinion, and expert reports are not before this court . . . at this moment. Live fact witness, he is a fact witness. And he will testify to facts. He will ask questions. You will object. I'll make the rulings, and we will move on. . . . That's the best way, practical way to do it: question by question. . . . I cannot blanket . . . make a ruling . . . because he's calling him as a fact [witness]."

[19] The plaintiff has provided the following examples of questions its counsel asked of Cianfaglione on direct examination, the contractor's objection, and the court's ruling:

"[The Plaintiff's Counsel]: Sir, when you were hired at the beginning by the Department of Public Works, were you providing factual information to the department based upon your review of the records?

"[The Witness]: Well, I'm looking at the facts as they are presented and forming an analysis on those.

"[The Plaintiff's Counsel]: Now, later on, were you hired subsequently by the attorney general's office to perform expert opinion work?

"[The Witness]: Later on, yes.

"[The Plaintiff's Counsel]: Did you consider the work you were performing later on—earlier on to be expert opinion work or just what you were hired to do as part of your job?

"[The Witness]: When I'm stating when I think the project is going to be finished, I would consider that to be my opinion.

"[The Plaintiff's Counsel]: But was your opinion based upon facts that you observed?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: Okay. I'm only asking this witness about the facts that he observed, not his opinion, Your Honor.

"The Court: Sustained.

"[The Plaintiff's Counsel]: So, you're saying that anything this person may have seen is not admissible? . . . I'm just asking you, Your Honor, for a clarification.

"The Court: The ruling is made. Please proceed.

"[The Plaintiff's Counsel]: Sir, could you please tell us what you personally observed when you walked the site when you were hired by the Department of Public Works to look at the manner in which the construction was proceeding?

"[The Contractor's Counsel]: Same question; same objection, Your Honor.

"The Court: And same ruling.

                    * * *

"[The Plaintiff's Counsel]: When you walked the project, what did you observe with respect to the number of men that were on the project doing work at any given time?

"[The Contractor's Counsel]: Objection, Your Honor, calls for expert opinion.

"The Court: Sustained.

                    * * *

"[The Plaintiff's Counsel]: Did you, sir, have discussions with the [contractor's] representatives concerning their progress on the project?

"[TheWitness]: Yes. . . .

                    * * *

"[The Plaintiff's Counsel]: Did you have discussions with [the contractor] concerning the work proceeding in an orderly fashion?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: And what was . . . what did [the contractor] tell you about their proceeding in an orderly fashion?

"[The Contractor's Counsel]: Objection, Your Honor. If you're talking about a response to a conversation that he had about orderly fashion, that would be based on this witness' expert opinion and analysis of the schedule so far.

"The Court: Sustained.

"[The Plaintiff's Counsel]: May I be heard on that, Your Honor?

"The Court: Go ahead.

"[The Plaintiff's Counsel]: The witness testified he had a conversation as a fact witness; he had a conversation with somebody. I asked him about what was the response to that conversation. What was he told.

"The Court: Orderly fashion. Same ruling. Let's move on."

[20] On appeal, neither of the parties addressed whether Cianfaglione's conversations with the contractor's employees were hearsay.

[21] The transcript discloses the following:

"[The Plaintiff's Counsel]: [S]ir, could you please tell us what you personally observed when you walked the site when you were hired by the Depart-

ment of Public Works to look at the manner in which the construction was proceeding?

"[The Contractor's Counsel]: Same question; same objection, Your Honor.

"The Court: And same ruling.

"[The Plaintiff's Counsel]: Your honor, then I will ask for a disclosure of the witness as an expert witness. And there is no prejudice to the defense because they deposed this man.

"The Court: Okay. The motion—oral motion—is hereby denied.

"[The Plaintiff's Counsel]: May I inquire from the court why?

"The Court: Absolutely not. Ruling is made."

[22] Practice Book § 13-15 provides in relevant part: "If, subsequent to compliance with any request or order for discovery and prior to or during trial, a party discovers additional or new material or information previously requested and ordered subject to discovery or inspection or discovers that the prior compliance was totally or partially incorrect or, though correct when made, is no longer true . . . that party shall promptly notify the other party . . . and file and serve . . . a supplemental . . . compliance."

[23] Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in an manner calculated to mislead, or has failed to respond to requests for production . . . has failed to comply with the provisions of Section 13-15 . . . the judicial authority may, on motion make such order as the ends of justice require.

"(b) Such orders may include the following . . .

"(4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence . . . ." See also footnote 22 of this opinion.

[24] We do not condone such litigation practice or strategy, as it fails to provide the opposing party with notice of its position and the legal basis thereof.

[25] More specifically counsel for the contractor argued: "[M]y client did provide a room full of documents. We provided all the documents on all communications between the parties, including the fact that there would be deductions from the contract specifically with respect to the installation of the 'WTs' and the clips by [the contractor] because [the plaintiff] was told that they were supposed to provide those things. And that they didn't provide those things. They were put on notice that [the contractor] was going to have to do the work and was going to have to deduct whatever it cost them from their contract. So, all of that information was made available to this party during the construction process itself, not just in discovery in this case. Additionally, they were provided with documents. I still have a room set aside in my firm's office that houses most of the documents from this project, so, they were, in fact, provided."

[26] The court clarified its ruling: "By ruling of this motion in limine, obviously, is gone. All right. Now, whatever counsel, when I asked her the clarification: what is the deduction? What is the meaning of setoffs? I would listen to the testimony of that effect."

[27] DPW apparently stands for Department of Public Works.

[28] She did not represent, however, that counsel for the plaintiff actually received the contractor's compliance.

[29] We recognize that the caption of a pleading is not controlling, but the substance of the allegation is controlling. See *In re Brianna F.*, 50 Conn. App. 805, 812, 719 A.2d 478 (1998).

[30] Stacking of the trades meant that various trades were tripping over one another to complete work and, thus, there was an interference with the flow of work. *Central Ceilings, Inc.* v. *Suffolk Construction Co.*, supra, 2013 WL 8721044, *4.

[31] The Massachusetts trial court distinguished delay from hindrance and interference. We need not address the distinction because the trial court in the present case found that the state and the architect were responsible for the project's not being finished by the completion date. The plaintiff's claims, therefore, are controlled by the "no damages for delay" clause in the subcontract.